## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 04 2017, 7:01 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In re the Paternity of Titus A. Gambrel | December 4, 2017 |
| | Court of Appeals Case No. 36A01-1706-JP-1475 |
| Willa Royal, | |
| *Appellant-Respondent,* | Appeal from the Jackson Superior Court |
| v. | The Honorable Bruce Markel III, Special Judge |
| Luke Gambrel, | Trial Court Cause No. 36D02-1503-JP-23 |
| *Appellee-Petitioner* | |

**Crone, Judge.**

# Case Summary

Willa Royal ("Mother") appeals the trial court's order finding her in contempt for denying Luke Gambrel ("Father") his scheduled parenting time with the couple's three-year-old son, Titus A. Gambrel ("Child"). She also challenges the trial court's denial of her motion to modify parenting time to limit Father's parenting time to supervised visits only. Finding that Mother has failed to establish prima facie error, we affirm.

# Facts and Procedural History

In February 2014, Child was born to Mother and Father out of wedlock. He was diagnosed with autism and is essentially nonverbal, communicating largely through sign language. He is involved in therapy five days per week, and his therapist considers him to be about six months behind the cognitive average. At some point, Mother and Father ended their romantic involvement, and their relationship became strained. In 2015, Father sought to establish paternity, and the trial court issued an order adjudicating Father as Child's biological father. In August 2016, the court issued an order awarding joint legal custody to Father and Mother, with Mother having physical custody and Father paying child support. The court granted Father unsupervised parenting time in accordance with the Indiana Parenting Time Guidelines, which essentially amounted to ten-hour visits on Saturdays and Sundays of alternating weekends, with no overnights. Mother filed a petition for clarification of the parenting time order, which the trial court dismissed on Father's motion.

[3] On December 17, 2016, Child spent all day at Father's house, which Father shares with his father and brother. Shortly before Mother's evening pickup time, Father changed Child's diaper and did not notice anything unusual. Around 7:00 p.m., Mother and her boyfriend ("Boyfriend") dropped off Child at the home of Boyfriend's mother ("Meme"). Mother did not change Child's diaper before dropping him off. Meme's other son Noah bathed Child that evening, and when Mother picked up Child around 1:00 a.m., Meme told her that Noah had noticed some bruises on Child. When Mother took Child home and changed his diaper, she saw small bruises on his leg and up one side of his body. She took photos of the bruises. The next morning, Mother and Father communicated by text concerning the inclement weather, which forced the cancellation of Father's regular parenting time. Mother did not ask Father about the bruises, and Father later testified that he did not know about Child's bruises until his sister-in-law informed him of it several days later.

[4] Over the next couple days, Child's bruises became more pronounced and discolored, and Mother notified the Department of Child Services ("DCS"). Mother told the assessing family case manager ("FCM") that she believed that Father had physically abused Child. A medical assessment indicated that Child's bruises were consistent with a finding of abuse. On December 22, 2016, Mother signed a DCS community services safety plan, which provided that Father would be limited to supervised visitation with Child, with Mother as monitor. Petitioner's Ex. 1.

[5]     Father learned about the DCS safety plan a week later, when Mother texted him and included a screenshot of the document. In the ensuing weeks, Mother and Father traded numerous texts, most of which concerned Father asking to see Child, Mother telling Father that he could no longer see Child except at her house or at a public place under her supervision, and Father refusing Mother's supervision and reminding her that court orders overrule DCS safety plans.

[6]     On February 16, 2017, Father filed a petition for rule to show cause why Mother should not be held in contempt for defying the trial court's 2016 parenting time order. On March 14, 2017, Mother filed a petition to modify Father's parenting time to supervised visits only, per the DCS safety plan. At a combined hearing on both motions, FCM Debra Satterfield testified that according to her notes, no one from DCS contacted Father before they had Mother sign the safety plan. She noted that Father had denied the abuse allegations in an interview with police and that DCS had no witness statements or other information showing that Father was the source of Child's bruises. She also reported that Mother had a DCS substantiation in 2014 for neglect of Child.[1] Child's therapist testified as to his special need for a consistent routine, and Mother and Father both testified on their own behalf. The trial court took matters under advisement and issued an order finding Mother in contempt and denying her petition for parenting time modification.

---

[1] Mother testified that this substantiation was not for her but for her mother. Nevertheless, she admitted that she allowed her mother to pick up and drop off Child, even over Father's objections. Tr. Vol. 2 at 35. *See also* Petitioner's Ex. 4 (text message from Father objecting to driving arrangements for Child).

[7] Mother now appeals. Additional facts will be provided as necessary.

## Discussion and Decision

[8] Mother contends that the trial court abused its discretion in finding her in contempt and in denying her petition to modify parenting time. Because her arguments involve the same standard of review and underlying facts, we address them together. We review the trial court's ruling on both a contempt petition and a parenting time modification petition using an abuse of discretion standard. *See Van Wieren v. Van Wieren*, 858 N.E.2d 216, 223 (Ind. Ct. App. 2006) (contempt finding); *Meisberger v. Bishop*, 15 N.E.3d 653, 656 (Ind. Ct. App. 2014) (parenting time decision).

[9] As a preliminary matter, we observe that Father has not filed an appellee's brief. Where an appellee fails to file a brief, we do not undertake to develop arguments on his behalf; rather, we may reverse upon a prima facie showing of reversible error. *Morton v. Ivacic*, 898 N.E.2d 1196, 1199 (Ind. 2008). Prima facie error is error "at first sight, on first appearance, or on the face [of] it." *Id*.

[10] Father filed a petition for rule to show cause why Mother should not be held in indirect contempt of court for failing to adhere to the 2016 parenting time order. Indirect contempt of court "is the willful disobedience of any lawfully entered court order of which the offender has notice." *In re Paternity of M.F.*, 956 N.E.2d 1157, 1163 (Ind. Ct. App. 2011) (quoting *City of Gary v. Major*, 822 N.E.2d 165, 169 (Ind. 2005)). Thereafter, Mother filed a petition seeking to modify Father's parenting time to supervised only. "A court may not restrict

parenting time unless that parenting time 'would' endanger the child's physical health or emotional development." *Hatmaker v. Hatmaker*, 998 N.E.2d 758, 762 (Ind. Ct. App. 2013) (quoting *D.B. v. M.B.V.*, 913 N.E.2d 1271, 1274 (Ind. Ct. App. 2009), and Ind. Code § 31-17-4-1(a)). A party seeking to restrict a parent's visitation rights has the burden of proving by a preponderance of evidence that a restriction is justified. *Id.* "[A]n order for supervision constitutes such a restriction." *Id.*

[11] Here, Mother predicated her petition to modify parenting time on Father's alleged abuse of Child.[2] Father steadfastly denied that he abused Child or did anything to cause Child's bruises. FCM Satterfield testified that DCS had not interviewed Father but that Father had given an interview to local law enforcement in which he denied the abuse allegations. She also testified that DCS had not taken any witness statements that pointed to Father as the cause of Child's bruises. Tr. Vol. 2 at 15. She admitted that DCS did not interview Meme or Noah, who had given Child his bath a few hours before Mother observed the bruises. *Id.* at 16. Mother admitted both to DCS and during the hearing that she had never observed Father being aggressive with Child and that she did not know whether Father had been the one who inflicted the bruises. *Id.* at 50. She said she knew that the bruising had happened "at [Father's] residence." *Id.* at 51. When asked how she could be so certain that Meme or

---

[2] Mother's brief includes a litany of Father's alleged shortcomings as a parent, i.e., having a child support arrearage, not caring about Child's therapy, and not having a toddler bed for Child at his house. However, these matters do not amount to a showing of endangerment sufficient to support a restriction in parenting time.

Noah had not caused Child's injuries during the five hours that they watched him, Mother said, "Your [sic] right I didn't see it. It is true speculation, but I know these people like the back of my hand." *Id*. at 50. Simply put, DCS based its safety plan on Mother's assumption that Father had abused Child.

[12] In examining whether Mother willfully defied a court order, we observe that she was aware of the 2016 parenting time order and had adhered to it for several months without issue. Yet, when she observed Child's bruises, she went straight to DCS and accused Father of abuse without even informing him of the existence of the bruises, let alone asking if he knew how Child had gotten them. At the same time, she discounted any possible involvement of others who had watched Child after he returned from Father's house. DCS issued the safety plan without verifying the accuracy of Mother's assertions about Father, a plan that not only purported to prevent Father from having unsupervised visits with Child but also named Mother as the supervisor/monitor. Mother wielded the safety plan against Father, even though he reminded her that she was still subject to the trial court's 2016 parenting time order. She claims that she chose to adhere to the safety plan because she feared reprisal from DCS. However, the timing of her petition to modify parenting time (filed shortly after Father's petition for order to show cause) supports a reasonable inference that she was aware of the court order's precedence over the safety plan and was simply attempting to avoid the consequences of having defied the court order. The record supports the trial court's finding that Mother willfully disobeyed the parenting time order, which unquestionably takes precedence over the safety

plan. Mother has failed to demonstrate prima facie error in the trial court's finding of contempt and denial of her petition to modify parenting time. Accordingly, we affirm.

[13] Affirmed

Robb, J., and Bradford, J., concur.